## THE MOONLIGHT.

## THE JOHN F. WINSLOW.

### MIDDLETON v. THE JOHN F. WINSLOW AND THE MOONLIGHT.

*(District Court, S. D. New York. April 18, 1892.)*

1. COLLISION—VESSEL AT BULKHEAD—LANDING OUTSIDE—RISK.
   The landing of a heavy vessel in a strong tideway outside of a light vessel, which is lawfully moored at a bulkhead, is wholly at the risk of the vessel so attempting to land, and she is liable for any injury she may inflict on the vessel at rest.
2. SAME—TUG AND TOW—IMPROPER LANDING—WHEN BOTH LIABLE.
   Where a tug with a tow alongside attempts to land outside another boat, and both tug and tow concur in making the attempt, and a bad landing is made through the influence of both, both are responsible for any damage such landing may occasion.

In Admiralty. Libel for collision.
*Carpenter & Mosher,* for libelant.

*Goodrich, Deady & Goodrich,* for the tug.
*Alexander & Ash,* for the schooner.

BROWN, District Judge. On the 6th of April, 1891, the tug John F. Winslow took in tow upon a hawser the schooner Moonlight, loaded with a cargo of wood, consigned to Benjamin F. Gerken, who had a wood yard at Seventy-Fifth street, East river. The schooner was taken to the short dock at Seventy-Fifth street, headed down river against the flood tide, and a line temporarily made fast to the dock from outside of a brick barge that was unloading there. Being told that he would get a berth sooner at Seventy-Sixth street, the master requested the tug to assist him in going there, to which the tug assented. The landing at Seventy-Sixth street was a bulkhead, alongside of which were already moored two boats, the libelant's barge being the outside boat, and light. The line to the Seventy-Fifth street dock was cast off, and the schooner allowed to drift up stern first in the strong flood tide, while the tug still kept hold of her, regulating and checking her movements as desired. When she had got abreast of the libelant's boat, her sternway was stopped by the tug, and, both tug and schooner putting their wheels to port, the schooner was gradually worked alongside of the libelant's boat and then made fast to the shore. The libelant claims that she came alongside with a crash, causing the canal boat to spring a leak badly; so that she gradually filled with water, and before she could be rescued on the next day, she was swamped by the swell of a passing steamer, when, being cut loose from the boat to which she was attached, she drifted away with the tide and became a total loss. The above libel was filed to recover the damage.

The evidence is of the most contradictory character. A number of the libelant's witnesses who were present testify that the schooner landed against the libelant's boat with a loud crash; one said it could be heard half a block away; the captain of the schooner says she landed against the canal boat so gently, that she would not have broken an eggshell.

The landing of such a schooner alongside a light canal boat in a strong tideway is evidently not free from either difficulty or danger. I think it was wholly at the risk of the schooner and tug. The canal boat was rightly where she was. The right to land a third vessel, loaded as this schooner was, outside of a light canal boat, was certainly not an absolute right; and the schooner, therefore, took whatever risk attended it. The great weight of testimony is that the schooner came alongside with a sufficient blow to account naturally for the leak that followed. The wood loaded on deck projected over the schooner's rail; and when she sagged up against the canal boat, the wood, or the fenders on the side of the wood, necessarily caught the upper part of the canal boat's side, and created a far greater strain by lateral pressure against the tops of her timbers, than would have occurred in the ordinary meeting of boats side to side.

The most unusual circumstance in the matter is the fact that the captain of the canal boat, who was aboard at the time, made no complaint

against the schooner either then or afterwards. His unusual reticence is urged as evidence that the claim is ill grounded or fictitious. The master, however, immediately went to the agent's office to report the difficulty. It is plain that he did not apprehend any immediate loss of the boat; and he made no effort to keep the boat clear by pumping; explaining that the leak was too great to be controlled in that way. The captain had also only come aboard that day a few hours before, replacing the former captain discharged. His appearance shows that he was a person of little energy or efficiency, though sufficiently intelligent. Taking these circumstances altogether, I am inclined to think they sufficiently account for his conduct, without any impeachment of his good faith, or of the general credit of the narrative given by the libelant's witnesses. In appearance, manner, and testimony they compare favorably with the captain of the schooner.

Whether the tug was or was not bound to take the schooner to Seventy-Sixth street after having arrived at Seventy-Fifth is immaterial, since upon the schooner's request she acceded, and took charge of landing her at Seventy-Sixth street. Both were active in making the landing up to the moment the libelant's boat was struck; both concurred in making the attempt; and the sagging against the canal boat was under the influence of the tug and the schooner alike; both were immediate agents, and equally active in the work; and both are, therefore, equally responsible for the result.

The libelant's boat was no doubt an old one. She was bought in April, 1889, for $350, and the repair bills since were small. She was, however, in fair condition for the class of business in which she was engaged; she was of value to the owner, in a lawful business, and was without fault. The libelant is, therefore, entitled to recover his actual damage. *The Granite State*, 3 Wall. 310. Besides the ordinary repair bills, her depreciation since she was purchased would be about $50 per year. Two hundred and fifty dollars would, therefore, seem to be a fair allowance for the boat; and for the other items mentioned upon the trial $150 would probably be a reasonable allowance, making $400, with interest. But, as the evidence of the damage was not perhaps fully gone into, if either party is not satisfied with this sum, he may have an order of reference, paying the costs thereof if a more favorable result is not secured.